Filed 12/13/16

**CERTIFIED FOR PUBLICATION**


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT


| | |
|---|---|
| PATRICK S. RYAN, | H041712 |
| Plaintiff and Appellant, | (Santa Clara County Super. Ct. No. CV218713) |
| v. | |
| CROWN CASTLE NG NETWORKS, INC., | |
| Defendant and Respondent. | |


Plaintiff Patrick S. Ryan brought this action against his former employer, NextG Networks, Inc., and its successor Crown Castle NG Networks Inc. (collectively NextG). He alleged in essence that NextG had breached a promise to grant him lucrative stock options as a condition of his employment. The case went to the jury with an unclear special verdict form and unhelpful instructions. The jury sustained two contract-based causes of action, but failed to find the value of the promised options, despite a directive on the verdict form that it do so. Instead it made a finding of the income plaintiff lost by entering the employment relationship, despite a directive obviating such a finding in light of the jury's rejection of plaintiff's tort causes of action. Plaintiff moved for a new trial on the ground of inadequate damages. The trial court denied the motion while disclaiming the power to "substitute its judgment for that of the jury" and suggesting that declarations were necessary to determine "what the jury actually did." We will reverse with instructions to grant a new trial. The court was fully empowered and indeed

obligated to make an independent assessment of the adequacy of the verdict. Moreover, the verdict was unmistakably unsound. If viewed as an award of tort damages, it had no foundation in law. If viewed as an award of contract damages, it had no foundation in fact. It is in all likelihood the product of juror confusion, improper compromise, or some combination of the two. Either way the findings of liability are sufficiently suspect that a retrial cannot fairly be limited to damages. Accordingly, we will direct that the court conduct a new trial on all issues unless plaintiff elects to stand on the previous judgment.

## BACKGROUND

At the time of the events in question, NextG was a major provider of distributed antenna systems, which are a means of providing wireless connectivity. Plaintiff was an attorney, much of whose solo practice consisted of advising or representing NextG as an independent contractor. His principal contact at NextG was Robert Delsman, its vice president of government relations and regulatory affairs. Around the summer of 2009 NextG was acquired by Madison Dearborn Partners (Madison Dearborn), a private equity firm. At around that time Delsman moved into the position of general counsel. One of NextG's co-founders approached plaintiff about filling Delsman's previous position, which would require him to become a full-time NextG employee. Plaintiff testified without contradiction that the job would pay less than he had been earning in his private practice. As described to him, however, the job would include a stock option that "would be worth quite a bit of money at some point in the future."

Negotiations ensued between plaintiff and NextG. On September 9, 2009, Delsman e-mailed plaintiff a draft offer which stated in part, "[W]e will recommend to Company's Board of Directors that, at the first applicable Board of Directors meeting, you be granted an option to purchase 75,000 shares of the Company's Common Stock at an exercise price equal to the then current fair market value as determined by the Board of Directors at such meeting." The letter stated that one-quarter of the promised shares

2

would "time-vest one year after the date of grant and 1/48th of the . . . shares . . . shall time-vest monthly thereafter, so that the Option shall be fully time-vested four (4) years from the date of grant, subject to your continued service to the Company on the relevant vesting dates." The draft said nothing about any other vesting conditions.

Plaintiff was concerned that under these terms the options could be deprived of value if Madison Dearborn sold the company before the options had "time-vest[ed]." He therefore asked Delsman to "add an acceleration clause to the options vesting such that all options immediately vest in the event of a sale or transfer." Delsman forwarded to plaintiff some additional language, to be incorporated in the final offer, stating that the options would be subject to time vesting and to "performance-vesting, the details of which will be set forth in your grant agreement and which are the customary performance-vesting provisions applicable to all options granted by the Company." Plaintiff testified, apparently without contradiction, that he had not previously encountered the term "performance vesting" and that he took it to refer to satisfactory performance of his own duties, which was already a condition of his receiving a promised annual bonus. He also appeared to have the understanding, at least initially, that the new terms described an *alternative* means of vesting, devised in response to his concerns about a sale; thus he wrote back to Delsman that while he "like[d] the proposal to *accelerate* vesting based on performance," it did not really meet his concerns, because the company could still be sold prior to vesting. (Italics added.) Delsman replied that he did not "like the 'performance vesting' component" and did not "know what it means."

On September 17, 2009, NextG communicated a formal written offer to plaintiff including the performance-vesting clause. He signed the offer the next day and promptly entered into NextG's employ. Several months later, in January 2010, he received two copies of a document entitled "NextG Networks, Inc. 2009 Stock Award Plan / Stock Option Agreement" (option grant). It indicated that a stock option had been granted to

3

him for 75,000 shares of common stock at an exercise price of $8.73 per share, with a "[v]esting [c]ommencement [d]ate" of August 27, 2009. After time-vesting language conforming to plaintiff's offer letter, it set out the following provision: "No portion of the Option shall performance-vest until the date . . . that the Sponsors' Cash-on-Cash Return (as defined below) measured as of such measurement date equals eight percent (8%)." "Cash-on-Cash Return" was given a very complex definition involving return on the investment of certain unidentified "Sponsors."[1] In argument to the jury, counsel for plaintiff summarized the provision as meaning that "the owners are going to have to get all of their cash back plus eight percent."

Although the "Sponsors" were not identified in the option grant, that and various other relevant terms were defined in a separate document, simultaneously adopted by NextG's directors, entitled "NextG Networks, Inc. 2009 Stock Award Plan" (stock award plan).[2] That document contained other relevant terms, including a 90-day limitations period for exercising options after separation from employment.[3]

---

[1] "PERFORMANCE BASED VESTING: No portion of the Option shall performance-vest until the date, subject to the Optionee continuing to be a Service Provider (other than a Director who is not also an Employee or Consultant) from the Date of Grant through such date, that the Sponsors' Cash-on-Cash Return (as defined below) measured as of such measurement date equals eight percent (8%). For the avoidance of doubt, this Option shall be performance-vested at all times following the earliest date on which such condition is met.

"[¶] . . . [¶]

" ' (d) Cash-on-Cash Return' means, as of any measurement date: the annual interest rate (compounded annually) which, when used to calculate the net present value of all Sponsor Inflows and all Sponsor Outflows, causes such net present value amount to equal zero. The Cash-on-Cash Return shall be determined in good faith by the Administrator."

[2] The stock award plan provided in pertinent part as follows:

"(pp) 'Sponsors' means, collectively, MDP, Accel, Redpoint, and Meritech."

4

The option grant and stock award plan were seemingly prepared with the expectation that they would be construed and applied together: the option grant referred repeatedly to "the Plan" and even included language incorporating "the Plan" by reference. However plaintiff testified that he was never provided with a copy of the stock award plan, or otherwise made aware of its existence—let alone its contents—until well after leaving NextG's employ. Similarly, another attorney in the legal department testified that she did not receive a copy of the plan, and was unaware of any 90-day limitation, until after she was told that she could no longer exercise her options. In a letter contesting this assertion, which was read to the jury without objection, she wrote that when she left NextG's employ in March 2011, "the stock plan had not been provided to any option grantees that I knew in spite of request for it." Likewise, plaintiff testified that he had spoken to several other employees and none of them reported receiving a copy of the plan. NextG's senior director of human resources testified that she and

"(v) 'MDP' means Madison Dearborn Capital Partners VI-A, L.P., Madison Dearborn Capital Partners VI-C, L.P., Madison Dearborn Capital Partners VI Executive-A, L.P., Madison Dearborn Capital Partners V-A, L.P., Madison Dearborn Capital Partners V-C, L.P., and Madison Dearborn Capital Partners V Executive-A, L.P., together with their respective Affiliates."

"(a) 'Accel' means Accel Growth Fund L.P., Accel Growth Fund Strategic Partners L.P., Accel Growth Fund Investors 2009 L.L.C., Accel X L.P., Accel X Strategic Partners L.P., Accel Investors 2009 L.L.C., ACP Family Partnership L.P., Ellmore C. Patterson Partners, Arthur C. Patterson, Joseph P. Schoendorf, Ashton DePeyster, Craig Stapleton, and Auchincloss Wadsworth & Co., L.P., together with their respective Affiliates."

"(ii) 'Redpoint' means Redpoint Omega, L.P. and Redpoint Omega Associates, LLC, as nominee, together with their respective Affiliates."

[3] "[T]he Option shall remain exercisable for ninety (90) days following the Optionee's termination . . . . If, after termination, the Optionee does not exercise his or her Option within the time specified herein, the Option shall terminate, and the Shares covered by such Option shall revert to the Plan."

5

another human resources worker "had trouble in the very beginning obtaining the stock option documents from upper management." She testified in deposition that her department had "difficulty making sure that everybody had received what they were supposed to receive and keeping track of that."

In January 2011 plaintiff resigned from NextG to pursue, as he testified, other interests. In December of that year, after learning that NextG had been acquired by Crown Networks, he e-mailed Delsman to ask what this meant for option holders. Delsman told him that he would have difficulty exercising his options because of the 90-day limitation period set out in the stock award plan. Plaintiff testified that this was when he first learned of a separate plan document and of the 90-day provision.

Despite Delsman's warning, plaintiff sent NextG a letter accompanied by a check for $218,250 and a notice of exercise of the options as to the 25,000 shares that had time-vested when he left employment.[4] NextG's then-general counsel responded that the attempted exercise was ineffective because of the 90-day clause and because the options had not performance-vested when plaintiff left employment.

Plaintiff filed this action on February 14, 2012. As ultimately amended, the complaint asserted causes of action for (1) breach of employment agreement; (2) breach of the covenant of good faith and fair dealing implied in the employment agreement; (3) fraud and fraudulent concealment; (4) negligent misrepresentation; (5) breach of stock option agreement; (6) breach of the covenant of good faith and fair dealing implied in the stock option agreement; and (7) declaratory relief.

---

[4] In his exercise letter plaintiff explained that he arrived at 25,000 shares based on the lapse of 16 months between the option commencement date and his separation from employment. He calculated that 1/4 of his 75,000 shares (18,750 shares) vested at the end of his first year, with an additional 4/48 of the total (6,250 shares) vesting in the four months thereafter. NextG has not contested these calculations.

6

At trial plaintiff called an expert witness on the subject of damages, who calculated that the net value of the 25,000 shares that had time-vested was $326,250. Defendant's expert, while contesting plaintiff's entitlement to any shares, described this calculation as "probably . . . right." Plaintiff's expert further opined that plaintiff had given up $73,522 in income by accepting the job with NextG.

The case was submitted to the jury on a special verdict form instructing jurors to answer questions concerning each cause of action before answering any questions about damages. The jury answered yes to all questions pertaining to the claims for "Breach of Employment Agreement" and "Breach of Covenant of Good Faith and Fair Dealing—Employment Agreement."[5] Under each of the remaining causes of action, the jury made a finding fatal to liability.[6] On the question of damages, the jury did not determine the

[5] Under the heading "Breach of Employment Agreement," the jury answered "yes" to the following questions: "1. Were the contract terms clear enough so that the parties could understand what each was required to do?" "2. Did the parties agree to give each other something of value?" "3. Did the parties agree to the terms of the contract?" "4. Did PATRICK S. RYAN do all, or substantially all, of the significant things that the employment agreement required him to do?" "6. Did NEXTG NETWORKS, INC. fail to do something that the contract required it to do?" "7. Was PATRICK RYAN harmed by that failure?"

Under the heading "Breach of Covenant of Good Faith and Fair Dealing—Employment Agreement," the jury answered "yes" to the following questions: "8. Were the contract terms clear enough so that the parties could understand what each was required to do?" "9. Did the parties agree to give each other something of value?" "10. Did the parties agree to the terms of the contract?" "11. Did PATRICK S. RYAN do all, or substantially all, of the significant things that the employment agreement required him to do?" "13. Did NEXTG NETWORKS, INC., unfairly frustrate PATRICK S. RYAN's right to receive the benefits of the employment agreement?" "14. Was PATRICK RYAN harmed by that failure?"

[6] Under "Intentional Misrepresentation," jurors found that NextG had not "ma[d]e a false representation of an important fact to PATRICK RYAN." Under "Concealment," they found that NextG did not "intentionally fail to disclose an important fact that PATRICK RYAN did not know and could not reasonably have discovered." Under "False Promise," they found that NextG had "ma[d]e a promise to PATRICK S. RYAN

7

value of the options, although it was instructed to do so if it sustained any of the contract-related claims. Instead it found that plaintiff had sustained lost earnings of $73,522—although a finding on that question was called for only if the jury sustained one or more tort claims, which it declined to do.[7] Nothing was done to address this discrepancy before the jury was excused.

Plaintiff moved for a new trial on the issue of damages only, unless defendant agreed to increase the amount of the judgment to $326,250. Plaintiff argued that the damages found were inadequate (Code Civ. Proc., § 657, subd. (5)) in that, having found NextG liable in contract, the jury applied an "incorrect measure of damages" by finding the amount of lost earnings rather than the value of the options. NextG responded that

---

that was important to its offer of employment," but that NextG "intend[ed] to perform this promise when it made it." Similarly, they found that NextG "ma[d]e a false representation of an important fact," but that NextG "honestly believe[d] that the representation was true," and "ha[d] reasonable grounds for believing the representation was true." Finally, under "Breach of 2009 Stock Award Plan Stock Option Agreement" and the associated breach-of-covenant claim, jurors answered negatively the question, "Were the contract terms clear enough so that the parties could understand what each was required to do?"

[7] Under the heading "Damages," the verdict contained the following entries (italics added): "55. *Value of Stock Options*: Enter the amount below if you find that NEXTG NETWORKS, INC. is liable to PATRJCK RYAN under any of the following claims: [¶] (a) Breach of Employment Agreement; [¶] (b) Breach of Implied Covenant of Good Faith and Fair Dealing (Employment Agreement); [¶] (c) Breach of 2009 Stock Award Plan Stock Option Agreement; [¶] (d) Breach of Implied Covenant of Good Faith and Fair Dealing (2009 Stock Award Plan Stock Option Agreement).

"$ _____

"56. *Lost Earnings*: Enter the amount below if you find that NEXTG NETWORK.S, INC. is liable to PATRICK RYAN under any of the following claims: [¶] (a) Intentional Misrepresentation; [¶] (b) Concealment; [¶] (c) Promissory Fraud; [¶] (d) Negligent Misrepresentation.

"$ 73,522.$\frac{00}{100}$"

8

the jury's award was proper, but that if a new trial were to be ordered, it should extend to all issues.

The trial court denied the motion. This timely appeal followed.

**DISCUSSION**

## I. Necessity for New Trial

### A. Court's Failure to Weigh Evidence

During the hearing on the motion for new trial, the trial court implied that it was powerless to question the adequacy of the jury's award: "[Y]ou're asking me to . . . say that the number of 320—sorry, the 326,250 number is exactly right.[8] And . . . that it's inadequate to that sum. And I'm not sure if that's *something I can do*." (Italics added.) Later the court seemed to evince the belief that if the jury failed to credit plaintiff's evidence, that treatment must be accepted as conclusive: "[W]hat if the jury just basically rejected your theory of the damages getting to 326 [i.e., $326,250] and then needed to get to a different number, and they really only heard a few numbers, so that's why they found the $73,000 number. So in your argument, what do I do with the fact that maybe—I'm wondering if maybe the jury just rejected it because they didn't think it was proven." In its written order, the court suggested that a new trial was unwarranted because it was "possible" that jurors had "decided that the sum of $73,552 was reasonable compensation." The court declared itself unable to "substitute its judgment for that of the jury."[9]

---

[8] The question whether $326,500 was "exactly right" was relevant only to the secondary question whether the court should grant plaintiff's motion for additur, i.e., a new trial unless defendant consented to entry of judgment for this sum. The larger question, whether to grant a new trial at all, depended not on the "exact[] right[ness]" of the amount sought by plaintiff but on the adequacy of the amount awarded by the jury.

[9] The court wrote, "[T]he jury . . . did find a breach of the employment agreement. In doing so, the jury awarded $73,552 to plaintiff. . . . [P]laintiff cannot show that his precise figure of $326,250 . . . was the only option available to the jury when it found a

9

In this the court erred.  When a trial court rules on a motion for new trial based upon inadequacy of the evidence, it is vested with a "plenary" power—and burdened with a correlative duty—to independently evaluate the evidence.  (*Barrese v. Murray* (2011) 198 Cal.App.4th 494, 503.)  For these purposes a motion asserting inadequate or excessive damages is governed by the same standards and principles as one asserting that the evidence is insufficient to sustain the verdict.  (See *Collins v. Lucky Markets, Inc.* (1969) 274 Cal.App.2d 645, 652, disapproved on another point in *Scala v. Jerry Witt & Sons, Inc.* (1970) 3 Cal.3d 359, 370, fn. 6; Code Civ. Proc., § 657 [motion on either ground not to be granted "unless after weighing the evidence the court is convinced from the entire record, including reasonable inferences therefrom, that the court or jury clearly should have reached a different verdict or decision"].)  In such cases, the court "has the power 'to disbelieve witnesses, reweigh the evidence, and draw reasonable inferences therefrom contrary to those of the trier of fact' (*Mercer v. Perez* (1968) 68 Cal.2d 104, 112, 65 Cal.Rptr. 315, 436 P.2d 315)"; it "sits as 'an independent trier of fact' (*Neal v. Farmers Ins. Exchange* (1978) 21 Cal.3d 910, 933, 148 Cal.Rptr. 389, 582 P.2d 980)"; and it "must 'independently assess[] the evidence supporting the verdict' [citation]."  (*Ibid*.)  "The trial judge has 'to be satisfied that the evidence, as a whole, was sufficient to sustain the verdict; if he was not, it was not only the proper exercise of a legal discretion, but his duty, to grant a new trial.'  (*People v. Lum Yit* (1890) 83 Cal. 130, 134, 23 P.

breach of the employment agreement.  The jury was told in Instruction 350 that it must decide 'how much money will reasonably compensate' the plaintiff for breach of the employment agreement.  It is possible that the jury decided that the sum of $73,552 was reasonable compensation.  To attempt to surmise otherwise, without factual declarations that demonstrate what the jury actually did, would require the Court to speculate. [¶]  The Court is only authorized to grant a motion for new trial after weighing the evidence in the entire record and concluding that the jury clearly should have reached a different verdict.  The Court is not permitted to substitute its judgment for that of the jury. In addition, motions for new trial are to be strictly construed.  As such, the Court cannot grant plaintiff's motion."

10

228.)" (*Barrese v. Murray, supra,* 198 Cal.App.4th at p. 503; see *Collins v. Union Pacific R. Co.* (2012) 207 Cal.App.4th 867, 882 [court acts as "an independent trier of fact"]; *In re Elliot's Estate* (1952) 114 Cal.App.2d 747, 748 ["[I]t is the duty of the trial judge to review all the evidence, weigh its sufficiency and judge the credibility of the witnesses. He is at liberty to disregard the findings of the jury which are implied from the verdict. He functions as a thirteenth juror."]; *Maroney v. Iacobsohn* (2015) 237 Cal.App.4th 473, 486 ["In considering Plaintiff's new trial motion, the trial court had the power to reweigh this evidence in its exclusive role as the 13th juror."].)

The trial court's refusal to "substitute its own judgment for that of the jury" may originate in language in *Kelly-Zurian v. Wohl Shoe Co.* (1994) 22 Cal.App.4th 397, 414 (*Kelly-Zurian*), which might be understood to call for greater deference to the verdict than is suggested by the foregoing authorities. That case in turn relied on *People v. Robarge* (1953) 41 Cal.2d 628, 633, and *Dominguez v. Pantalone* (1989) 212 Cal.App.3d 201, 215 (*Dominguez*), which relied on the same criminal decision. Most criminal cases, including much more recent ones, are fully in accord with the authorities cited above. (See *Porter v. Superior Court* (2009) 47 Cal.4th 125, 133 ["The court extends no evidentiary deference in ruling on a[] [Pen. Code, §] 1181(6) motion for new trial. Instead, it independently examines all the evidence to determine whether it is sufficient to prove each required element beyond a reasonable doubt to *the judge*, who sits, in effect, as a '13th juror.' "]; *People v. Lewis* (2001) 26 Cal.4th 334, 364 ["On a motion for a new trial, a trial court must review the evidence independently, considering the proper weight to be afforded to the evidence, and then deciding whether there is sufficient credible evidence to support the verdict."]; *People v. Lagunas* (1994) 8 Cal.4th 1030, 1038 ["When, after a jury verdict, a trial court rules on a new trial motion, it independently assesses the evidence supporting the verdict."]; *People v. Price* (1992) 4 Cal.App.4th 1272, 1275 ["An unsuccessful litigant is first entitled to a decision by the jury and then

11

independently by the judge who must consider the sufficiency of the evidence, weigh the conflicts and inconsistencies and evaluate the credibility of witnesses. In making this determination the court must use its own judgment and cannot rely on the jury's conclusions."]; *People v. Veitch* (1982) 128 Cal.App.3d 460, 467 [court is "under the duty to give the defendant the benefit of its independent conclusion as to the sufficiency of credible evidence to support the verdict"]; *People v. Megladdery* (1940) 40 Cal.App.2d 748, 768 [trial judge "may disregard such evidence as he believes to be untrue and may draw inferences therefrom at variance from those drawn by the jury"], overruled on other grounds by *People v. Simon* (2001) 25 Cal.4th 1082, 1108, and disapproved on another point in *People v. Posey* (2004) 32 Cal.4th 193, 214-215; cf. *People v. Fuiava* (2012) 53 Cal.4th 622, 729-730, quoting *People v. Davis* (1995) 10 Cal.4th 463, 523-524 [" 'In reviewing a motion for a new trial, the trial court must weigh the evidence independently. [Citation.] It is, however, guided by a presumption in favor of the correctness of the verdict and proceedings supporting it. [Citation.] The trial court "should [not] disregard the verdict . . . but instead . . . should consider the proper weight to be accorded to the evidence and then decide whether or not, in its opinion, there is sufficient credible evidence to support the verdict." [Citation.]' "].)[10]

---

[10] Indeed it is doubtful that even the 1953 criminal case relied upon by *Kelly-Zurian* and *Dominguez* can sustain the level of deference apparently attributed to those cases by the court below. In that case the trial court had denied a motion for new trial even though it found that key eyewitness testimony was " 'awfully hard . . . to believe,' " and conflicted with the testimony of a "much better witness." (*People v. Robarge, supra,* 41 Cal.2d at p. 634.) "Other remarks show clearly that the trial court disbelieved much of Muldrow's testimony and entertained serious doubts as to the validity of his identification of defendant, but the court nevertheless indicated at least three times that it was bound by the contrary conclusion of the jury. It is therefore evident that the trial court failed to give defendant the benefit of its independent conclusion as to the sufficiency of credible evidence to support the verdict." (*Ibid.*) Accordingly, the judgment was reversed. It appears that *Kelly-Zurian* and *Dominguez* were led astray by manner in which the court articulated the governing legal principles. The precedential core of any decision, however, is not its expression of abstract principles but its *application* of those principles

We doubt that the courts in *Kelly-Zurian* and *Dominguez* meant to diverge from the foregoing cases so far as to support the approach taken by the court below. We think the decision in *Kelly-Zurian* is best understood as recognizing a power in the trial court to uphold a jury verdict as resting on *sufficiently* weighty evidence, even if the court itself might have reached a different conclusion. Certainly the case cannot be understood to mean that the trial court can refuse to conduct its own independent evaluation of the evidence. On the contrary, the reviewing court acknowledged the trial court's obligation to "weigh the evidence and judge the credibility of witnesses." (*Kelly-Zurian*, *supra*, 22 Cal.App.4th at p. 413.) The trial court there had apparently done so, and said that it might have decided the case differently; but it had apparently not found the movant's view of the evidence so compelling as to warrant a new trial. In the passage echoed by the court below, the reviewing court observed, "Because the trial court *implicitly found there was sufficient credible evidence* to support the verdict, and that *the jury was reasonable in believing the witnesses it apparently had believed* in reaching the verdict, the trial court properly *declined* to substitute its own judgment for that of the jury." (*Id.* at p. 414, italics added.) In other words, the court did not say, as the court below did, that the trial court is *barred* from "substitut[ing]" its judgment for the jury's.[11] In a proper case it has not only the power, but the duty, to do so.

---

to the facts before it. (See 9 Witkin, Cal. Procedure (5th ed. 2008) Appeal, § 509, pp. 572-574)

[11] *Dominguez* is to similar effect: The trial court stated that, although it made an " 'independent determination and weigh[ing of] the facts,' " it believed that reasonable minds could differ and, on that basis, could not "upset the verdict." (*Dominguez*, *supra*, 212 Cal.App.3d at p. 216.) The reviewing court took this to reflect an implied finding "that there was sufficient credible evidence to support the verdict, and that the jury was reasonable in believing the witnesses it apparently had believed in reaching its verdict." (*Ibid.*)

Nothing in the record here suggests that the trial court evaluated the evidence. Its refusal to exercise its power to independently evaluate the sufficiency of the award amounted to failure to exercise a discretion vested by law, which of course is error. (See *Law Offices of Dixon R. Howell v. Valley* (2005) 129 Cal.App.4th 1076, 1090-1091, quoting *Fletcher v. Superior Court* (2002) 100 Cal.App.4th 386, 392 [" ' "[f]ailure to exercise a discretion conferred and compelled by law constitutes a denial of a fair hearing and a deprivation of fundamental procedural rights, and thus requires reversal" ' "]; *Lippold v. Hart* (1969) 274 Cal.App.2d 24, 26 ["where the comments of the trial judge indicate that he misconceived his duty at the hearing on the motion for new trial, an appellate court will not blindly affirm the judgment below"].)

### B. Immateriality of Juror Declarations

The trial court also suggested in its written order that the verdict could not be overturned in the absence of "factual declarations" showing "what the jury actually did." As a rationale for the denial of plaintiff's motion for new trial, this suggestion fails on multiple levels. At the threshold, there is a certain irony in the court's remark, since a chief purpose of the special verdict was to "establish what the jury actually did." The verdict here, defective as it was, did not entirely fail of this purpose: it clearly established that the jury misunderstood the case, because it awarded damages on causes of action it rejected, while failing to award damages on causes of action it sustained. Juror declarations might have illuminated *why* the jury did this strange thing, but that question possessed only marginal relevance to the task before the trial court, which was to determine whether $73,522 was sufficient compensation for the breach of contract the jury had found. Moreover, even if the jury's reasoning had been relevant, declarations would probably have been inadmissible insofar as they would have tended to impeach the verdict. (See *Bell v. Bayerische Motoren Werke Aktiengesellschaft* (2010) 181 Cal.App.4th 1108, 1125-1126; *Bossi v. State of California* (1981) 119 Cal.App.3d 313,

14

318 [declaration asserting that jurors had not voted as they claimed when polled was incompetent pursuant to Evidence Code section 1150]; *People v. Romero* (1982) 31 Cal.3d 685, 694 ["In cases of a 'deliberative error' which appears to produce a mistaken or erroneous verdict, the result has almost invariably been to bar impeachment of the verdict."].)

### C.  Lack of Factual or Legal Basis for Award

The central question before the trial court was whether the record contained substantial evidence that the damages on plaintiff's contract causes of action amounted to no more than $73,552.[12] If the record contained such evidence, the door might be open to a conclusion that the trial court's error was harmless because it probably would have reached the same result under proper legal principles. In fact, however, the record before us affords *no basis whatsoever* to conclude that the damages on the contract claims, as those claims were framed in the instructions and the verdict form, amounted to only $73,522. On the contrary, the undisputed evidence established that if plaintiff's contract claims were sound, his damages amounted to over four times that amount, i.e., $326,250.

As the case was presented to the jury, the only damages sought by plaintiff on his contract causes of action were his "expectation" or benefit-of-the-bargain damages, i.e., the sum required to "put [plaintiff] in as good a position as he would have been in had the contract been performed, that is, had there been no breach." (Rest.2d, Contracts, § 344, com. a; see Rest.2d, Contracts, § 347.) It was undisputed that as applied here, this measure consisted of the value of the options, i.e., the market value of NextG shares times the number of shares vested less the "exercise price" plaintiff was obliged to pay in order to exercise them. For this reason the jury was told that if it sustained any of the contract causes of action it should determine the value of the options. Defendant did not

---

[12] We will sometimes use the term "contract claims" to include plaintiff's causes of action for breach of covenant.

contest any of the variables used by plaintiff's expert to calculate this value, i.e., 25,000 time-vested shares, exercise price of $8.73 per share, and market value of $21.78 per share, for a net value of $13.05 per share and a total net value of $326,250.[13]

Nor do we see any plausible indication that the jury understood $73,522 to be the value of the options. The relevant finding was made in response to a question plainly labeled "Lost Earnings." Another question, entitled "Value of Stock Options," was left blank. The jury thus did not purport to find that $73,522 represented the value of the options. Nor was there any factual basis for it to do so; as a product of the three relevant variables (number of shares times the difference between exercise price and market value), that figure defies rational explanation.

The lost earnings found by the jury constituted harm flowing not from the *breach* of any contract but from plaintiff's *entry into* the contract in the expectation of receiving the promised options. Such "reliance" damages may sometimes be recovered on a contract claim "[a]s an alternative" to expectation damages. (Rest.2d, Contracts, § 349; see Rest.2d, Contracts, § 3.44, com. a; *Toscano v. Greene Music* (2004) 124 Cal.App.4th 685, 692 [plaintiff's prospective wages from former at-will employer, lost in reliance of defendant's offer of employment, recoverable as a kind of reliance damages].) But here plaintiff sought such damages only in connection with his *tort* claims. The only damages the jury was asked or instructed to find in connection with the contract causes of action were plaintiff's expectation damages, i.e., the value of the promised options. The verdict form, which was apparently the product of a joint effort by counsel, presupposed that the damages for breach of any of the contract-based causes of action were equal to the value

---

[13] Defendant all but concedes this point on appeal, acknowledging its own expert's agreement with plaintiff's that "the [net] value of 25,000 shares . . . [as of] April 2012 . . . , was $326,250." In argument below, defense counsel raised the possibility that plaintiff might have been entitled to half that number of shares, but the jury's award does not approach that figure ($163,125) either.

16

of the options. At no time did defendant assert that the verdict form was deficient in this or any other respect. The jury's finding of lost earnings instead, if viewed as an award of contract damages, is without foundation in law.

Defendant's arguments to the contrary are not readily distilled into a syllogistic form. First defendant asserts that plaintiff's contract damages presented "an open factual question for the jury to decide" and that juries possess " 'relatively unfettered authority and responsibility' to calculate damages. (Quoting *Garfoot v. Avila* (1989) 213 Cal.App.3d 1205, 1210.) Thus, defendant asserts, "the trial court properly presented the damages issue to the jury as an open fact question for them to decide . . . ." This observation might be germane if jurors had decided that question by, e.g., finding that the options were worth less than plaintiff claimed—though no evidentiary basis for such a finding readily appears. But the point is academic because jurors failed to answer the "open factual question" to which defendant refers. Instead, in seeming disregard of the plain instructions in the verdict form, they awarded a different *kind* of damages than those to which, as the parties tacitly agreed, plaintiff was entitled by law.

Defendant repeats this same analytical error in a variety of ways. Thus it asserts that "[a]t no point did Mr. Ryan request an instruction *requiring* the jury to award $326,250 if it found NextG breached the Employment Agreement." (Italics added.) But aside from any other issues such a request might have raised, the question is not whether the finding plaintiff sought was established as a matter of law but whether there was any basis, legal or factual, for the finding the jury actually made. Had they found that the options had a value other than the one asserted by plaintiff, defendant's arguments might gain some traction. As it is, they simply miss the point.

In its opposition papers below, NextG suggested that the jury's award might "represent[] the value *to Mr. Ryan* of the *promise* of potential stock options in the Employment Agreement, measured by the amount Mr. Ryan was *willing to give up* by

17

divesting himself of his other business interests in exchange for those stock options." (Italics added.)  In lay terms, this is like saying that the jury had the power to, in effect, *refund plaintiff's money* in lieu of enforcing NextG's contractual promise according to its terms.  In legal terms, this is a description of reliance damages.  As we have already noted, plaintiff did not seek such damages and neither the instructions nor the verdict form provided any basis for the jury to award them.  Even if plaintiff had sought both forms of damage, it would be for the plaintiff, not the jury, to make any election between them.  (See Rest.2d, Contracts, § 378 [election by party who "has more than one remedy"]; *Astoria Federal Sav. & Loan Ass'n v. United States* (Fed. Cl. 2006) 72 Fed.Cl. 712, 718 ["A plaintiff may pursue expectancy and reliance damages in the alternative, and is entitled to recover the highest amount it can prove under any measure of damages."].)

There was simply no basis for the jury to award only lost earnings after having answered affirmatively all the questions relating to breach of contract.  It follows that the trial court erred by denying plaintiff's motion for new trial.

## II.  Scope of Retrial

This leaves the question whether to require a new trial of damages only, as sought by plaintiff, or to direct a retrial of all issues, as defendant insists is necesary.

The law on this subject is reasonably well settled.  A retrial limited to damages will ordinarily save judicial resources and should therefore be considered if " 'it can be reasonably said that the liability issue has been determined by the jury.' " (*Liodas v. Sahadi* (1977) 19 Cal.3d 278, 285.)  However, "even when it appears that the issue of liability was correctly determined, a new trial limited to damages 'should be granted . . . only if it is clear that no injustice will result . . . .  [A] request for such a trial should be considered with the utmost caution [citations] and . . . any doubts should be resolved in favor of granting a complete new trial.' " (*Id.* at pp. 285-286; see *Collins v. Lucky*

18

*Markets, supra,* 274 Cal.App.2d 645, 654-655; *Amavisca v. City of Merced* (1957) 149 Cal.App.2d 481, 488.)  Indeed, " '[w]hen a limited retrial might be prejudicial to either party, the failure to grant a new trial on all of the issues is an abuse of discretion.' [Citation.]" (*Liodas v. Sahadi*, *supra*, at p. 286.)  "For like reason an appellate court will not grant a new trial as to limited issues when an injustice might result." (*Baxter v. Phillips* (1970) 4 Cal.App.3d 610, 617.)

Here the special verdict appears to disclose, at first glance, "that the issue of liability was" decided by the jury. (*Liodas*, *supra*, 19 Cal.3d at p. 285.)  Certainly the jury answered all relevant questions in a manner consistent with liability for breach of the employment contract and for violating the associated covenant of good faith and fair dealing.  However, it is impossible to conclude on this record that "the issue of liability was correctly determined" (*id.* at pp. 285-286), and even if it was, we are quite unable to say that the soundness of that determination is free of doubt.  On the contrary, the record raises grave doubts whether the jury properly understood the issues put to it and even whether it meant to find an injurious breach of the parties' contract.

The first cause of doubt is the logical inconsistency on the face of the special verdict:  The jury failed to determine the value of the options despite an instruction that it do so if it found that NextG was "liable to [plaintiff] [on] any of the [contract-related] claims."  Given the outcome, it is entirely possible that the jury did not correctly apprehend the intended meaning of the quoted phrase.  The verdict form did not by its terms ask the jury to "find" defendant "liable" on *any* claims.  Rather it asked a series of questions under each claim—many of them quite poorly framed—without making any explicit link between those answers and any "finding" of liability.  This raises the

19

possibility that the jury did not understand itself to have found NextG liable in contract, and perhaps did not intend to do so.[14]

Further, an undue risk of prejudice is always present, and a retrial limited to damages can never be justified, when the record raises a substantial likelihood that the verdict was the product of compromise. The three factors mostly commonly suggesting such a possibility are a patently inadequate damage award, close or difficult issues of liability, and a non-unanimous verdict. (See *Malcomson v. Pool* (1969) 276 Cal.App.2d 378, 380; *Clifford v. Ruocco* (1952) 39 Cal.2d 327, 330; *Kralyevich v. Magrini* (1959) 172 Cal.App.2d 784, 792; *Hamasaki v. Flotho* (1952) 39 Cal.2d 602, 606; *Rose v. Melody Lane* (1952) 39 Cal.2d 481, 489; *Pelletier v. Eisenberg* (1986) 177 Cal.App.3d 558, 565; *Flores v. Brown* (1952) 39 Cal.2d 622, 632; *Amavisca v. City of Merced*, *supra*, 149 Cal.App.2d at p. 488; cf. *Ona v. Reachi* (1951) 105 Cal.App.2d 758, 763.)

---

[14] The logical inconsistency between the jurors' answers on the liability questions and their *failure* to determine the value of the options—despite the directive to do so—probably rendered the verdict "against law," furnishing an independent basis to require a complete new trial. (Code Civ. Proc., § 657, subd. (6); see *McCoy v. Gustafson* (2009) 180 Cal.App.4th 56, 91-92; *Singh v. Southland Stone, U.S.A., Inc.* (2010) 186 Cal.App.4th 338, 358; *Oxford v. Foster Wheeler LLC* (2009) 177 Cal.App.4th 700, 721.) However neither party moved for a new trial on that ground, nor has either asserted it on appeal. Since we are reversing for a new trial on other grounds, there is no occasion to consider the extent to which a court should or must take note of such a defect on its own motion. (See *Keener v. Jeld-Wen, Inc.* (2009) 46 Cal.4th 247, 265, quoting Haning et al., Cal. Practice Guide: Personal Injury (The Rutter Group 2008) ¶ 9:672 [failure to request correction of defective verdict before jury is excused forfeits objection " 'unless the verdict itself is inconsistent' "]; *City of San Diego v. D.R. Horton San Diego Holding Co., Inc.* (2005) 126 Cal.App.4th 668, 682, quoting *Cavallaro v. Michelin Tire Corp.* (1979) 96 Cal.App.3d 95, 101, 157 Cal.Rptr. 602 [" ' "Where the findings are contradictory on material issues, and the correct determination of such issues is necessary to sustain the judgment, the inconsistency is reversible error." ' "].) We note the defect only to further emphasize that the special verdict, on its face, raises grave questions about what the jury meant to find and thought it was finding.

All of these factors are present here. When polled, jurors revealed that they had divided 9-3 on the central questions whether NextG "fail[ed] to do something that the contract required [it] to do," whether it "unfairly frustrate[d] [plaintiff's] right to receive the benefits of the employment agreement," and whether plaintiff was "harmed by [those] failure[s]."[15] Further, as already discussed, the sum found by the jury was a fraction of the amount established without genuine controversy as the net value of the promised shares. And finally, as discussed in greater detail below, as presented to the jury the issues of liability on the contract causes of action were close and difficult. These factors all raise the possibility that some jurors, at least, entertained serious doubts about defendant's liability in contract but were willing to find such liability if damages were limited to plaintiff's out-of-pocket losses—or that jurors were only willing to find a breach of contract because they felt plaintiff was entitled to his out-of-pocket losses, and found themselves unable, for whatever reason, to sustain any of the tort claims. In short, the circumstances point toward a significant possibility of a jury compromise affecting

---

[15] The vote on the later questions may have been tainted by some jurors' belief that once a juror had voted against any finding necessary to sustain a given cause of action, he or she should either abstain or vote against liability on all remaining questions concerning that cause of action. The trial court initially shared this belief, telling one juror that it was "perfect" and "right" to, as the juror reported, "skip[]" a question, and then report a "no" vote during polling, after the juror "said no to the previous question." Indeed when it appeared that not all jurors had consistently followed this practice, the court sent the jury out for further deliberations. The court eventually realized that this was error in light of the rule that each juror can vote on each question, and can give answers conducive to liability, even if he or she has answered other questions in a manner that would preclude liability. (See *Resch v. Volkswagen of America* (1984) 36 Cal.3d 676, 679.) Upon recognizing its mistake the court recalled the jury, but by then jurors had reached a new verdict. The court proposed to set aside the new verdict and reinstate the original verdict. Counsel for both parties assented to this treatment. No attempt was made to clarify how many dissenting jurors in the original verdict had voted—or abstained—in accordance with the original, erroneous supposition.

21

not only the damages issues, and not only the contract issues, but all issues embraced by the verdict.

Further, quite apart from suspicions of jury compromise, a new trial limited to damages may be unfair or impracticable if the original verdict fails to clearly show "on what basis liability was predicated." (*Liodas v. Sahadi*, *supra*, 19 Cal.3d 278, 286.) Here the basis for the finding of contract liability is heavily obscured by numerous ambiguities and perplexities. The instructions on both liability and damages were confusing, if not misleading. One instruction, standing alone, made it appear that lost income was the only item of damage sought by plaintiff. The offending instruction was sandwiched between one concerning defendant's vicarious liability for alleged misrepresentations by its officers, and another concerning damages for misrepresentation. From context it is clear that the instruction was intended to apply only to plaintiff's tort claims. But it did not say so. It said, "If you decide that Patrick Ryan has proved *his claim against Defendant NextG* . . . you also must decide how much money will reasonably compensate Patrick Ryan for the harm. . . . [¶] . . . [¶] *The following are the specific items of damages claimed by Patrick Ryan:* [¶] *1. Lost earnings* [¶] To recover damages for past lost earnings, Patrick Ryan must prove the amount of income that he has lost."

Other instructions attempted to make clear that lost earnings were relevant only to the tort claims, and that the damages "recoverable" for the contract claims were "Value of Stock Option."[16] But none of them did so any more clearly than the special verdict

---

[16] "The following items of damages are recoverable only once under Intentional Misrepresentation; Concealment; Promissory Fraud; and Negligent Misrepresentation:

"1. Lost earnings.

"The following additional items of damages are recoverable only once for; Breach of Employment Agreement; Breach of Covenant of Good Faith and Fair Dealing (Employment Agreement); Breach of 2009 Stock Award Plan Stock Option Agreement

22

form. Since jurors apparently failed to comprehend the form, there is every reason to believe that they misunderstood the instructions too.

Further potential for confusion appears in an instruction that "[i]n no event" could plaintiff "recover both his lost . . . earnings and the value of his stock options." We question not the accuracy of this statement but the necessity and wisdom of issuing it to the jury. An award of lost earnings would presuppose that plaintiff had detrimentally relied on a wrongful promise, representation, or omission, and would seek to restore him to the position he would have occupied *if no contract had been made*. Recovery of the value of the options presupposed an enforceable contractual promise of options, and would seek to place him in the position he would have occupied *if the contract had been performed*. To award both types of damage would grant him the benefit of the bargain while awarding losses he willingly incurred to make that bargain. The law does not permit such a windfall. It was this principle that the quoted instruction embodied.

But however accurate the instruction may have been, and however germane the principle it stated, there was no reason to burden the jury with it. Such an instruction would have been appropriate if the case had been decided on a general verdict, because in that circumstance the jury, upon finding liability, would have returned a single undifferentiated damage award, which might conceal duplicative or inconsistent elements. But this risk was obviated here by the special verdict, which required the jury to make separate findings on contract and tort damages. If jurors sustained all of plaintiff's causes of action, and found both types of damage, the trial court could easily have taken appropriate steps to ensure that the ensuing judgment awarded one or the other types of damage, but not both. (See *Singh v. Southland Stone, U.S.A., Inc.*, *supra*,

---

and Breach of Covenant of Good Faith and Fair Dealing (2009 Stock Award Plan Stock Option Agreement):

"1. Value of Stock Option."

186 Cal.App.4th 338, 361["The jury should be instructed . . . that the court, rather than the jury, will resolve any concerns regarding duplication of damages."]; cf. *DuBarry Internat., Inc. v. Southwest Forest Industries, Inc.* (1991) 231 Cal.App.3d 552, 565, fn. 16 [dictum that admonition against duplicative damages was required in special verdict case; criticized on this point in *Singh*, *supra,* 186 Cal.App.4th 338].)

In sum, there was simply no reason to burden jurors with this principle of law, and there is every possibility that doing so contributed to their confusion. Given the outcome, it is possible that they understood this instruction to mean that it should only *find* one or the other form of damages; if so, they may have concluded that they should *choose between them*, awarding whichever they deemed more fitting.

We detect various other deficiencies in the verdict. Many questions rested on tacit assumptions about the nature of the issues to be decided—assumptions that may not have meshed with the jury's understanding of the case. An example appears in the section devoted to plaintiff's claim for false promise: The jury was first asked whether NextG "ma[d]e a promise to Patrick S. Ryan that was important to its offer of employment to Patrick S. Ryan." Taken literally, this question could have only one answer, and that is the answer the jury gave: Yes. Of course NextG's offer of employment included at least one "promise . . . that was important." But the failure to identify what promise was being referred to injected an intolerable ambiguity into the jury's next answer, affirming that NextG "intend[ed] to perform this promise when it made it." Given this answer, the form instructed the jury to move on to the next cause of action. But in conjunction with the preceding question and answer, this response hardly disposed of the possibility that plaintiff was the victim of an actionably false promise. All these answers showed was that NextG made one or more promises that it *did* intend to perform. The pertinent question was whether it made any promises it did *not* intend to perform. The jury could well have found that it made such a promise by telling plaintiff his options would be

24

subject to the "customary" performance-vesting provision, when in fact they would depend on a condition that had never been applied to options before and would only be applied to some of them later. Under the form as written, the jury could have so found and yet rejected this cause of action because defendant *also* made material promises that it *did* intend to perform. Similar ambiguities—too many to enumerate here—pervade the special verdict form.

In view of these deficiencies it is quite impossible to say on what basis the jury found liability for breach of contract or even, in the minds of the jurors, that they *did* find such liability. This requires a retrial of all issues, or no retrial at all. In such a case it is recognized that "both parties may prefer the judgment as originally entered to the expense and uncertainty of a new trial on all issues." (*Hamasaki v. Flotho*, *supra*, 39 Cal.2d at p. 609.) If so, "[t]here is no reason why . . . the parties should not be allowed to adopt the jury's compromise as their own." (*Ibid.*) "If the defendant does not wish a new trial he need not move for one, and if the plaintiff does not wish a complete new trial . . . he need simply say so." (*Ibid.*) Here defendant has already made this election by not moving for a new trial. Plaintiff sought a new trial, but on damages only. He should therefore be given an opportunity to choose between a new trial on all issues and reinstatement of the judgment now under review.

## III. *Advisability of Special Verdict*

For the guidance of the court on remand, we comment on the advisability of employing a special verdict in a case such as this. It is true that, in at least some respects, a special verdict—if carefully drawn and astutely employed—may improve the quality of the factfinding process. It can focus the jury's attention on the relevant questions, incorporating the pertinent legal principles, and guiding the jury away from irrelevant or improper considerations. It can also expose defects in the jury's deliberations when they

25

occur, providing an opportunity for the court to seek correction through further deliberations.

As this case illustrates, however, these benefits are not always realized.  Here the verdict revealed a clear defect in the jury's decision, and yet nothing was done to correct it before the jury was excused—even though the jury was sent out for further deliberations on another, unwarranted ground (see fn. 15, *ante*).

Whatever the potential virtues of special verdicts when wisely employed, they also present "recognized pitfalls."  (*Falls v. Superior Court* (1987) 194 Cal.App.3d 851, 855.)  " '[T]he possibility of a defective or incomplete special verdict, or possibly no verdict at all, is much greater than with a general verdict that is tested by special findings . . . .' "  (*Ibid.*, quoting California Judges Benchbook (CJER 1981) Civil Trials, § 15.10, p. 473, brackets in original.)  A judgment based on such a verdict is more prone to reversal because the verdict  "requires the jury to resolve all controverted issues in a case, unlike a general verdict which implies findings on all issues in a party's favor."  (*Oxford v. Foster Wheeler LLC, supra,* 177 Cal.App.4th 700, 707 [special verdict].)

This case illustrates the point.  Had the jury here returned a general verdict for $73,522, and had judgment been entered accordingly, we would have inferred in support of the judgment that jurors had failed to find a breach of contract but had sustained one or more of the claims sounding in misrepresentation.  It is doubtful that either party could have successfully challenged this result.  And while it might have left both sides dissatisfied, we cannot say that it would not have represented a fair outcome, given the evidence before the jury and the manner in which the case was litigated.  However, because the award was patently inadequate in view of the jury's liability findings, reversal is compelled.

In addition, special verdicts present challenges for trial courts when they are drafted by adversaries in litigation.  They present an almost irresistible opportunity not

only to guide the jury's determination of dispositive issues but to influence it, subliminally or otherwise, to decide the case a particular way. The court here sought to obviate this concern by requiring counsel to jointly prepare the verdict form. But even if this provides some check against overreaching, it leaves open other hazards.

All litigation is ultimately a matter of striking a reasonable compromise among competing interests, particularly the interest in resolving cases fairly and that of utilizing public and private resources economically. A special verdict is unlikely to serve either of these objectives unless it is drawn with considerable care. While this verdict leaves us no alternative but to reverse the judgment, we hope that it may serve as an object lesson for bench and bar, the moral of which is to avoid this device unless both court and counsel are prepared to invest the time and attention necessary to ensure that it helps rather than hinders the just and efficient resolution of the case.[17]

---

[17] Special verdicts have also been criticized on the more abstract ground that, by disregarding the "conjunction rule," they exaggerate a logical fallacy pervading much of our factfinding jurisprudence. (Lombardero, Do Special Verdicts Improve the Structure of Jury Decision-Making? (1996) 36 Jurimetrics J. 275.) The conjunction rule holds that the probability of multiple independent statements being true (or multiple independent events occurring) is the *product* of their individual probabilities. This means that several statements may each be *probably* true—i.e., more likely than not—and yet their *combined* probability may remain well under 50 percent. In seeming contradiction of this principle, courts suppose that if jurors find each element of a tort established by a preponderance of the evidence—a more-likely-than-not standard—then the tort itself is established. The author of the above article demonstrates the probabilistic unsoundness of this approach by positing a three-element tort in which each element has a .7 (70 percent) likelihood of being true. (*Id*. at pp. 280-281.) Assuming the elements are independent of each other, the likelihood of all three being true is the product of their individual probabilities (.7 x .7 x .7), or .343—slightly over one in three. (*Id*. at p. 282.) The author notes that in many cases, the fallacy of supposing otherwise is mitigated by the observed tendency of jurors *not* to "analyze the evidence by following an element-by-element approach." (*Id.* at p. 284.) Instead they "use the evidence presented at trial to generate and test a variety of hypotheses or 'stories' to explain the evidence, then select the most credible story, and determine the ultimate facts in accordance with that story, provided they are sufficiently convinced of its truth." (*Id.* at p. 284, fn. omitted.) But a special verdict defeats this natural mitigating tendency: "If the jury finds in favor of the

## DISPOSITION

The judgment is reversed with directions to grant a new trial as to all issues unless plaintiff elects, by written notice filed within 30 days of this court's remittitur, to accept reinstatement of judgment based upon the original verdict. Each side will bear its own appellate costs.

---

plaintiff on each element essential to her case (and against the defendant on any affirmative defenses), the court will enter a [judgment] for the plaintiff." (*Id.* at p. 285, fn. omitted.)

                                    _____

                                           RUSHING, P.J.

WE CONCUR:

_____
        PREMO, J.

_____
        GROVER, J.

*Ryan v. Crown Castle NG Networks, Inc.*
**H041712**

Trial Court:                                    Santa Clara County Superior Court
                                                Superior Court No.: CV218713


Trial Judge:                                    The Honorable Erica R. Yew
                                                The Honorable James L. Stoelker
                                                The Honorable Socrates Peter
                                                Manoukian
                                                The Honorable Carol W. Overton


Attorneys for Plaintiff and                     T. Kelly Cox
Appellant Patrick S. Ryan:


Attorneys for Defendant and                     Kirkland & Ellis
Respondent Crown Castle Ng
Networks, Inc.:                                 Christopher W. Keegan
                                                Austin L. Klar


*Ryan v. Crown Castle NG Networks, Inc.*
**H041712**