Filed 4/11/18   Opinion on remand from Supreme Court

# CERTIFIED FOR PARTIAL PUBLICATION*


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE


| | |
|---|---|
| THE PEOPLE,<br><br>　　Plaintiff and Respondent,<br><br>　　v.<br><br>BOBBY WATTS,<br><br>　　Defendant and Appellant. | B270324<br><br>(Los Angeles County<br>Super. Ct. No. TA129035) |


　　APPEAL from an order of the Superior Court of Los Angeles County, Allen J. Webster, Jr., Judge.  Affirmed in part and reversed in part with directions.

　　Randy S. Kravis, under appointment by the Court of Appeal, for Defendant and Appellant.

　　Xavier Becerra, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant

---

　　* Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of part II of the Discussion.

Attorney General, Susan Sullivan Pithey and Esther P. Kim, Deputy Attorneys General, for Plaintiff and Respondent.

_____

A jury convicted Bobby Watts (Watts) of murder and found that Watts committed the offense for the benefit of, at the direction of, and in association with a criminal street gang. Watts then filed a motion for new trial, alleging the evidence was insufficient to sustain the jury's true finding on the gang enhancement allegation and that his trial attorney had provided ineffective assistance of counsel. The trial court denied the motion. On appeal, Watts contends the trial court abused its discretion in denying the motion. Watts also contends the trial court erred by precluding him from introducing evidence of the victim's blood alcohol level at the time of his death and that instructing the jury using CALCRIM No. 315 violated his due process rights. We hold that the trial court employed the incorrect test when reviewing Watts's new trial motion with respect to the gang enhancement allegation. We thus reverse the trial court order denying the motion with respect to the gang allegation only. We further hold that the case must be remanded so that the trial court can exercise its newly ripe discretion under Penal Code[1] section 12022.53, subdivision (h), and determine whether any of the imposed firearm enhancements should be stricken. The order is affirmed in all other respects.

_____

[1] All further statutory references are to the Penal Code unless otherwise indicated.

# BACKGROUND

## I.  Overview of charges

The Los Angeles County District Attorney's Office charged Watts with one count of murder (§ 187, subd. (a); count 1), and one count of possession of a firearm by a felon (§ 29800, subd. (a)(1); count 2).  The district attorney also alleged that Watts personally and intentionally discharged a firearm causing great bodily injury and death (§ 12022.53, subds. (b), (c) & (d)), and committed the offenses for the benefit of, at the direction of, and in association with a criminal street gang with the specific intent to promote, further, and assist in criminal conduct by gang members (§ 186.22, subd. (b)(1)(C).)  The district attorney further alleged that Watts had suffered a prior serious felony (§ 667, subd. (a)(1)), as well as a prior "strike" conviction (§§ 667, subds. (b)-(i) & 1170.12).  Watts pleaded not guilty and denied the special allegations.  A jury found Watts guilty as charged.[2]  After sentencing, Watts filed a notice of appeal.

---

[2] Watts waived his right to a jury trial with respect to the prior serious felony and prior strike convictions and the trial court found the allegations to be true.  The trial court then sentenced Watts to 80 years to life in state prison as follows: 25 years to life, doubled to 50 years to life under the "Three Strikes" law, plus 25 years for the personal use of a firearm enhancement, plus five years for the prior serious felony enhancement.  The court imposed a four-year sentence on count 2 but ordered it run concurrent to the sentence in count 1.  The court also stayed the gang enhancement and remaining firearm enhancements pursuant to section 654.  The court awarded Watts 953 days of presentence custody credits.

## II. Prosecution evidence

### A. FLOYD VIDEAU'S MURDER

On June 23, 2013, at approximately 4:00 a.m., Michelle Howard, Floyd Videau, and another individual were at a playground in the Imperial Courts Housing Projects when a man nicknamed "Little Chris" and his girlfriend drove up to the group. Little Chris told them to watch out for a car that had been circling the area. Howard remembered seeing a car pass by a few times but did not think much of it. Little Chris continued to tell Howard and Videau that he had spotted someone walking around the housing project. At one point, he said to that person, " 'Oh, you think you're trying to be slick. I see you.' "

As Little Chris continued to talk with the group, Howard saw the same car barreling down the street. The car was a dark, two-door vehicle with only one taillight, and Howard saw that there were two individuals in the car. As the car passed by, Little Chris said, "Oh, there he go right there. That's the car right there." Little Chris ran after the car, but returned to say that the car had disappeared. Someone then said, "Who is that?" and Howard turned to see Watts, about three feet away, coming toward Videau. Watts's right arm was beneath his left armpit. Little Chris started backing up and told everyone to watch out for Watts. Videau and Watts said something to each other. Howard then saw Watts pull out a gun, and saw a flash go off. Howard backed away and ran. As she ran away, she heard about five to seven gunshots. Howard later returned to the playground to see Videau's lifeless body on the ground.[3]

---

[3] Videau sustained a total of seven gunshot wounds. Two were fatal. The medical examiner who conducted Videau's

4

B.    SUBSEQUENT INVESTIGATION

Los Angeles Police Department (LAPD) Detective Scott Teubert responded to the shooting. When he arrived at the Imperial Courts Housing Projects at 7:00 a.m. that same day, Detective Teubert saw Videau's body on the ground with multiple gunshot wounds to his head, back, and right arm. The detective also saw three expended shell casings around Videau.

A few days after the shooting, LAPD Officer James Shannon staked out Watts's vehicle—a black 2003 Dodge Stratus coupe—as it sat parked next to El Camino College. A few hours after Officer Shannon began watching the vehicle, he saw the driver throw a piece of paper out the driver's side window.[4] Watts later got out of the vehicle and was arrested. Forensic print specialists analyzed the seven fingerprints lifted from Watts's vehicle and one fingerprint from a cup found inside the vehicle. Six of the eight fingerprints matched Watts's prints.

LAPD Officer Darryl Danaher, who worked for the crime intelligence task force, monitored closed-circuit television systems for multiple housing developments. On the night of the shooting, cameras captured Watts's vehicle multiple times around the area of the Imperial Courts Housing Projects. Dwight Nichelson, the custodian of records for Sprint Corporation, testified that, based on cell tower information, Watts was at the location of the shooting at the time it occurred.

---

autopsy opined that the two fatal gunshot wounds were to Videau's brain.

[4] Until this time, no one had walked to, entered, or exited the vehicle and police did not know anyone was in the vehicle during the two and half hour surveillance up to this point.

LAPD Detectives Nathan Kouri and Manuel Castaneda were assigned to investigate the circumstances of the shooting. Detective Kouri was aware that video surveillance cameras had been set up in the Imperial Courts Housing Projects and Nickerson Gardens to monitor activities within those housing projects. Detective Kouri was also aware that license plate recognition cameras were installed throughout the city.

Review of the various surveillance camera video showed Watts's vehicle leaving Nickerson Gardens at 3:27 a.m. and driving towards the Imperial Courts Housing Projects. After circling the Imperial Courts Housing Projects, Watts's car pulled into a laundromat next to the housing project at 4:00 a.m. Watts exited the passenger side of the vehicle, opened and rummaged through the trunk, and entered the driver's side of the vehicle to change his clothing. Watts then exited the vehicle and walked in a northbound direction. The vehicle left the parking lot sometime later and started circling the Imperial Courts Housing Projects. At 4:15 a.m., the driver of the vehicle pulled up to Watts, who was on foot, and after talking briefly, drove away. Watts walked towards the housing project and was later seen getting into the vehicle at 4:20 a.m. At 4:22 a.m., the vehicle approached the intersection of the Imperial Courts Housing Projects. At 4:27 a.m., surveillance video from a nearby parking lot showed individuals running away from the playground.

Detective Kouri interviewed Howard after the shooting. Howard identified Watts as the shooter from a six-pack photographic lineup. Howard said Watts was five feet six or

6

seven inches, with a slim build, and was wearing a blue and white striped shirt, dark pants and a hat when he shot Videau.[5]

C.     GANG EXPERT TESTIMONY

LAPD Officer Francis Coughlin testified as the prosecution's gang expert.  Officer Coughlin was the senior lead officer for the Nickerson Gardens Housing Project and he had been investigating gang crimes within that neighborhood for 17 years.  He had extensive gang training and had testified over a hundred times as a gang expert.

Officer Coughlin explained that the gang culture involves "putting in work" for the gang.  This means gang members must commit violent crimes for the benefit of the gang.  Committing a violent crime shows allegiance to the gang and establishes trust with fellow gang members.  It also enhances the reputation of the gang by instilling fear in the community.  Fear is important in the gang culture because it deters members of the community from reporting gang activity and establishes gang territory.

There are major gangs in South Central Watts. Each gang is located within a housing project.  The Bounty Hunter Bloods

---

[5] Howard initially declined to describe the shooter beyond the clothes he was wearing when he shot Videau.  When shown a six-pack with Watts's photo a few days later, Howard focused on two photos, number 3 (Watts) and number 4.  She told detectives that Watts's complexion was similar to that of the gunman but that number 4 looked to be the same age as the gunman.  When reminded that the lighting might be different, Howard chose Watts's photo.  Howard said Watts's complexion, eyes, and narrow facial structure were consistent with that of the shooter. Howard also identified Watts at the subsequent preliminary hearing and trial.  She based her identification on the features of Watts's face, specifically, his "odd bone structure."

are located in the Nickerson Gardens Housing Project, the Grape Street Crips are located in the Jordan Downs Housing Project, and the Project Watts Crips are located in the Imperial Courts Housing Projects. Officer Coughlin explained that the gangs in each housing project are rivals and members of each gang know not to cross into the rival housing projects. Gang members who cross into rival gang territory late at night or early in the morning are likely present to kill rival gang members.

Officer Coughlin is familiar with the Bounty Hunters gang. The gang has over 2,000 documented members and identified themselves as "BHW" in the color red. Gang members have tattoos of "B" and "H" for Bounty Hunters. The Bounty Hunters are territorial in nature. They claim the Nickerson Gardens Housing Project as its territory, along with its surrounding blocks. The Bounty Hunters are a profitable gang, whose income mainly came from selling drugs. The gang identifies the Grape Street Crips and the Project Watts Crips as their rivals. The Bounty Hunters main activities include graffiti, robbery, drug sales, and shootings.

According to Officer Coughlin, Watts is a member of the Bounty Hunters gang and is known as "Porky" or "GK Porky." Watts has several tattoos that are affiliated with the Bounty Hunters gang. His email address (gkporkybhw115@gmail.com) also identified him as a Bounty Hunters gang member. Officer Coughlin explained that GK stood for "Grape Killer," "Porky" was Watts's nickname, "BHW" stood for Bounty Hunter Watts, and "115" was for 115th Street, which was a subset of Bounty Hunter Watts in the Nickerson Gardens Housing Projects. Multiple text messages and Facebook photos with Watts throwing up Bounty Hunters gang signs led Officer Coughlin to opine that Watts was

a member of the Bounty Hunters gang. Officer Coughlin knew Videau to be a member of the rival Project Crips. Videau had tattoos showing his allegiance to the gang. Videau was also associated with Little Chris, who was a member of the Project Crips gang.

With respect to Videau's murder, Officer Coughlin opined that the killing was committed for the benefit of, at the direction of, or in association with the Bounty Hunters gang. The shooting benefited the gang because it reaffirmed the reputation of the gang as a violent gang. The shooting also reaffirmed the status of the gang to rival gang members, as well as the public, because it served as a warning to others not to encroach on their territory or to report crimes.

Watts presented no evidence in his defense.

## DISCUSSION

### I.   Watts's motion for a new trial

#### A.   GANG ENHANCEMENT ALLEGATION

Watts contends that trial court abused its discretion when denying his motion for a new trial on the ground that the evidence was insufficient to sustain the jury's true finding on the gang enhancement allegation. Watts filed the new trial motion pro se. In the motion, Watts asked the trial court to "reweigh the evidence regarding the sufficiency of the evidence to support the gang enhancement."[6] Watts claimed the following findings were

---

[6] Watts's motion also contended that the trial court erred in admitting Little Chris' statements. Watts does not address that issue on appeal. Watts also argued that he had received ineffective assistance of counsel, identifying several alleged errors committed by his attorney. Watts does re-raise this issue on appeal and it is addressed below.

9

not supported by substantial evidence—that it was Watts who sent the text messages found on his cell phone; that Watts was a gang member; that Videau's murder was gang related; that the people in Watts's car were Bounty Hunters gang members; that the Bounty Hunters and Project Watts Crips are rivals; and that Watts's Facebook name was gang related.

At the hearing on the motion, Watts again argued that the gang enhancement was not supported by sufficient evidence. The trial court said that although it understood Watts's argument, it could not review the claim: "But that, again, is an evidentiary ruling. It goes to the merits of the case. That's something that would go up on appeal. Whether this is a gang case or not is not a basis for a motion for new trial." "Because I know where you are going with this. Is that these two particular groups were not at war, okay. I understand that. But that is not the basis for a motion for new trial, whether the Bloods and Crips were at war or not. That has nothing to do with a motion for new trial. That's not one of the elements for [a] motion for new trial. That goes to the sufficiency of the merits of the case, which is something that will be taken up on appeal."

Throughout the hearing, the trial court continually maintained that Watts's claim was not appropriate for a new trial motion. "I don't understand why we are involving ourselves in this argument, because it doesn't go to one [of] the factors for a motion for new trial. [¶] . . . [¶] Where does it say that in [section] 1181, that that's one of the factors?"[7] Watts pointed the

---

[7] Section 1181 prescribes the grounds upon which a trial court may grant a new trial after a verdict or finding has been made. Subdivision 6 of section 1181 provides that a trial court may grant a new trial when "the verdict or finding is contrary to

court's attention specifically to subdivision 6 of section 1181. "Insufficiency of the evidence pursuant to [section 1181, subdivision (6)]," Watts answered. "The verdict or finding contrary to . . . the law or evidence, Penal Code [section 1181, subdivision (6)] requires that the trial judge independently reweigh the evidence. *People versus Davis*, 1985."[8] "It's not for me to reweigh the evidence," the trial court again insisted. "Because there was testimony that you were [a] Blood. You live in Nickerson Gardens, hang out in Nickerson Gardens. And this other person [who] was killed is a Crip, had on blue and was killed. So as far as the court is concerned, there was evidence to

---

law or evidence but if the evidence shows the defendant to be not guilty of the degree of the crime of which he was convicted, but guilty of a lesser degree thereof, or of a lesser crime included therein, the court may modify the verdict, finding or judgment accordingly without granting or ordering a new trial, and this power shall extend to any court to which the cause may be appealed."

[8] Watts was referring to *People v. Davis* (1995) 10 Cal.4th 463, which articulated the standard of review a trial court must follow when faced with a new trial motion. "In reviewing a motion for a new trial, the trial court must weigh the evidence independently. [Citation.] It is, however, guided by a presumption in favor of the correctness of the verdict and proceedings supporting it. [Citation.] The trial court 'should [not] disregard the verdict . . . but instead . . . should consider the proper weight to be accorded to the evidence and then decide whether or not, in its opinion, there is sufficient credible evidence to support the verdict.' " (*Id.* at pp. 523–524.) Although Watts did not provide the full citation to *Davis* when arguing before the trial court during the hearing, he did cite the case correctly in his new trial motion.

11

let the jury decide yes it was a gang case or no it wasn't. . . . Now whether it was or it wasn't, it's not for me to second guess the jury."

After discussing another claim asserted by Watts in his motion, the trial court returned to Watts's argument that insufficient evidence supported imposition of the gang enhancement. Watts reiterated that he was specifically asking the court to reweigh the evidence. The trial court informed Watts: "My job . . . is not to retry the case in my head and do whatever you want me to do because you think the evidence wasn't sufficient enough for the jury. That's what they do on appeal. That's not what I do, okay."

On appeal, Watts contends that the trial court "completely misunderstood the scope of its authority and its duty to independently reweigh the evidence supporting the gang enhancement allegation." For example, in *People v. Dickens* (2005) 130 Cal.App.4th 1245, the appellate court observed that "[t]he trial court's duty is to review the evidence independently and satisfy itself that the evidence as a whole is sufficient to sustain the verdict."[9] (*Id.* at p. 1251.) "Although the trial court is to be 'guided' by a presumption in favor of the correctness of

---

[9] Indeed, appellate courts have repeatedly emphasized the discretion afforded trial courts in this respect as well as the courts' duty to independently review the evidence. "It is the trial court's function to determine independently whether it is satisfied that there is sufficient credible evidence to sustain the verdict. If the record contains any substantial evidence which supports a judgment contrary to that of the jury, the trial court's ruling must be upheld, *even if there is also legally sufficient evidence to support the jury's verdict.*" (*People v. Dickens*, *supra*, 130 Cal.App.4th at p. 1254.)

the jury's verdict [citation], this means only that the court may not *arbitrarily* reject a verdict which is supported by substantial evidence." (*Ibid*.) "The trial court is not bound by the jury's determinations as to the credibility of witnesses or as to the weight or effect to be accorded to the evidence. [Citations.] Thus, the presumption that the verdict is correct does not affect the trial court's duty to give the defendant the benefit of its independent determination as to the probative value of the evidence. [Citation.] If the court finds that the evidence is not sufficiently probative to sustain the verdict, it must order a new trial."[10] (*Id.* at pp. 1251–1252.)

In short, the trial court "extends no evidentiary deference" when ruling on a new trial motion under section 1181,

---

[10] In contrast, a section 1118.1 motion seeks a judgment of *acquittal* for insufficient evidence. Thus, unlike when deciding a section 1181, subdivision (6) motion, the trial court "evaluates the evidence in the light most favorable to the prosecution." (*Porter v. Superior Court* (2009) 47 Cal.4th 125, 132.) In considering this legal question, "a court does not ' "ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt." [Citation.] Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (*People v. Lagunas* (1994) 8 Cal.4th 1030, 1038, fn. 6.) This test is the same as that used by appellate courts in deciding whether evidence is legally sufficient to sustain a verdict. (*Ibid*.) Notably, in a section 1118.1 motion, "the question . . . is simply whether the prosecution has presented sufficient evidence to present the matter to the jury for its determination." (*People v. Ainsworth* (1988) 45 Cal.3d 984, 1024.) This is the precise test erroneously employed by the trial court in Watts's case.

13

subdivision (6).  (*Porter v. Superior Court*, *supra*, 47 Cal.4th at p. 133.)  "Instead, it independently examines all the evidence to determine whether it is sufficient to prove each required element beyond a reasonable doubt *to the judge*, who sits, in effect, as a '13th juror.' "[11]  (*Ibid*.)  Thus, the grant of a section 1181, subdivision (6) motion "is the equivalent of a mistrial caused by a hung jury" and "does not bar retrial on double jeopardy grounds." (*Ibid*.)  "This rule permits trial court oversight of the verdict but ensures that the People, like the defendant, have the charges resolved by a jury."  (*Ibid*.)

We agree that the trial court employed the incorrect test when reviewing Watts's new trial motion, citing the legal standard used when ruling on a section 1118.1 motion rather than a section 1181, subdivision (6) motion.  The Attorney General contends that Watts has focused only isolated comments made by the trial court.  Not so.  A review of the motion hearing transcript reveals that the court repeatedly informed Watts it could not reweigh the evidence and that its only concern was whether the prosecution had presented sufficient evidence to present the matter to the jury.  Yet, "[w]hen a trial court rules on a motion for new trial based upon inadequacy of the evidence, it is vested with a 'plenary' power—and burdened with a correlative duty—to independently evaluate the evidence."  (*Ryan v. Crown Castle NG Networks, Inc*. (2016) 6 Cal.App.5th 775, 784.)  As discussed above, however, the court incorrectly articulated both the scope of its discretion as well as the legal standard by which Watts's new trial motion should be judged.

---

[11] Despite this edict, the trial court explicitly stated, "I'm not going to be the jury" when refusing to "second guess what the jury had to say."

14

The Attorney General also argues that Watts forfeited this claim because he did not inform the trial court during the hearing that it had employed the wrong legal standard.  Again, we disagree.  At the outset, we note that Watts was appearing pro se by this time, drafting both the new trial motion by hand and arguing directly before the trial court.  Moreover, Watts repeatedly argued that the court had the ability to independently reweigh the evidence supporting the gang enhancement.  Moving on to the merits, the Attorney General contends the court's ruling "as a whole" shows that it understood and applied the appropriate legal principles.  According to the Attorney General, the trial court expressly stated on numerous occasions that sufficient evidence was presented in support of the jury's verdict.  However, in the transcript pages cited by the Attorney General, the trial court explicitly told Watts:  "I didn't reweigh the evidence.  That's not my job to reweigh the evidence.  [¶] . . . [¶]  It's not for me to reweigh the evidence."  Although, as the Attorney General notes, the trial court did recount the gang evidence that had been presented to the jury, the court also made clear it would not "second guess" the jury's finding.  The court's position was that "there was basically enough to go to the jury"—the standard a court employs under section 1118.1, not section 1181, subdivision (6).  "This is not my decision," the court emphasized, "It's the jury's decision."

The trial court's question to Watts—"There was enough for the jury to make the finding, true or false?"—does not demonstrate that the court understood the scope of its authority.  While the trial court refused to reweigh evidence proffered by Watts at the hearing, but not admitted at trial, the court also refused to reweigh the evidence that had been received by the

jury during the trial. The Attorney General's theory—not Watts's theory—is inconsistent with the record and the statements made by the trial court at the new trial hearing. Indeed, the overall tenor of the comments supports the interpretation that the trial court misperceived the applicable standard and denied the motion by erroneously applying a section 1118.1 standard rather than the proper independent judgment standard.[12]

The Attorney General next contends that even if the trial court erred, the error was harmless because it is apparent the court would not have granted relief on the claim even if it had employed the correct legal standard. Thus, remand is not required. However, in cases with similar procedural postures,

---

[12] The Attorney General, perhaps recognizing the ambiguity inherent in the trial court's explanation of its ruling, relies on *People v. Davis*, *supra*, 10 Cal.4th 463, in which our Supreme Court stated that a trial court "has broad discretion in ruling on a motion for a new trial, and there is a strong presumption that it properly exercised that discretion." (*Id*. at. p. 524.) However, *Davis* provides no assistance here. The Supreme Court in *Davis* noted the record before it "establishe[d] that, after considering the motion for a new trial, in which it expressly articulated the correct standard of review, the trial court independently determined the credibility of the witnesses and the probative value of the evidence. Although defendant isolates statements in which the trial court refers to the jury's verdicts, *it is clear from the record as a whole that it did not regard itself as bound by any of the jury's findings*." (*Ibid*., italics added.) Although *Davis* indulged the "strong presumption" that the trial court's ruling was within its discretion, that conclusion was based in part on the trial court's express articulation of the correct standard and because the record as a whole showed the trial court knew it was not bound by the jury's findings. Neither of those factors is present here.

16

appellate courts have remanded to allow the trial court to exercise its discretion in the first instance. For example, in *People v. Robarge* (1953) 41 Cal.2d 628, the Supreme Court found an abuse of discretion when the trial court denied a motion for a new trial. The trial court had stated the jury was the sole judge of witness credibility, even if the court disbelieved what the witnesses said, so long as sufficient evidence existed to support the jury's decision. (*Id.* at p. 634.) *Robarge* held "it is the province of the trial judge to see that the jury intelligently and justly performs its duty and, in the exercise of a proper legal discretion, to determine whether there is sufficient credible evidence to sustain the verdict." (*Ibid.*) The Supreme Court reversed because the trial court made remarks which clearly showed it disbelieved a key witness but felt bound by the jury's contrary conclusion. As a result, it determined that the trial court "failed to give defendant the benefit of its independent conclusion as to the sufficiency of credible evidence to support the verdict." (*Ibid.*) The judgment and order denying the motion for a new trial were vacated with directions for the lower court to rehear the motion. If the trial court determined that a new trial should be granted, the defendant was entitled to a new trial on the merits. If it was determined that the new trial should be denied, then the trial court was directed to pronounce judgment again upon the defendant. (*Id.* at p. 635.)

In *Ryan v. Crown Castle NG Networks, Inc.*, *supra*, 6 Cal.App.5th 775, "[n]othing in the record . . . suggest[ed] that the trial court evaluated the evidence." (*Id.* at p. 786.) The trial court's "refusal to exercise its power to independently evaluate the sufficiency of the award amounted to failure to exercise a

17

discretion vested by law, which of course is error."[13]  (*Ibid*.)
Consequently, the Court of Appeal, Sixth District, reversed with
directions to grant a new trial." (*Id*. at p. 797.)

We review the trial court's denial of a motion for a new trial
for abuse of discretion.  (See *People v. Knoller* (2007) 41 Cal.4th
139, 156.)  "Such an abuse of discretion arises if the trial court
based its decision on impermissible factors [citation] or on an
incorrect legal standard." (*Ibid*.)  Here, the trial court's
comments suggest it did not independently review the evidence
and decide the proper weight to accord it.  The comment that
"there was enough for the jury to make the finding" indicates
deference to the jury's weighing of the evidence.  In sum, the trial
court did not articulate the correct standard of review, failed to
act as a 13th juror to review and independently evaluate the
evidence, and failed to give Watts the benefit of its independent
assessment regarding the sufficiency of credible evidence to
support the verdicts.  As such, we reject the Attorney General's
contention that a rehearing is not required.  Accordingly, the
judgment and order denying the motion for a new trial are

---

[13] In so holding, the court cited *Fletcher v. Superior Court*
(2002) 100 Cal.App.4th 386, 392 (failure to exercise discretion
constitutes denial of fair hearing and deprivation of fundamental
rights and requires reversal), *Lippold v. Hart* (1969) 274
Cal.App.2d 24, 26 (where trial judge misconceived duty at
hearing on new trial motion, appellate court will not blindly
affirm judgment) and see *People v. Carter* (2014) 227 Cal.App.4th
322, 328 (court abuses its discretion when it misconceives duty,
applies incorrect legal standard, or fails to independently
consider weight of evidence).

18

vacated and this matter is remanded for a new hearing consistent with this opinion.[14]

B.    INEFFECTIVE ASSISTANCE OF COUNSEL

Watts also contends that the trial court abused its discretion when it denied his motion for a new trial based on his trial attorney's alleged ineffective assistance of counsel.  Watts's claim was based on counsel's failure to call "Little Chris" as a trial witness, failure to object to the admission of prejudicial gang evidence, failure to object to the detective's overly suggestive identification procedure, failure to object to the admission of Imperial Courts Housing Projects' video footage as well as biblical verses found on Watts's phone.

In a proceeding that took place before the motion hearing, Watts emphasized counsel's failure to call Little Chris as a witness as the basis for the motion.  The trial court informed Watts that ineffective assistance of counsel was not a proper ground to raise in a new trial motion.  "Ineffective assistance of counsel is not one of the ground for motion for new trial.  [¶] Now, if in fact . . . it was ineffective assistance of counsel, that is something the appellate court would take up."  Watts attempted to correct the trial court.  The court countered that ineffective assistance of counsel was an issue on direct appeal rather than a new trial motion under section 1181.  "I don't know why [Little Chris] didn't testify.  I have no idea.  That's between you and your lawyer.  That is not for me to decide," the court told Watts.  "But that would be something that, assuming this matter goes to

_____

[14] Watts also contends the trial court miscalculated his pretrial credits.  On remand, the trial court shall recalculate Watts's custody time, using the correct date of arrest as the starting point for its calculation.

appeal, that would be something that the appellate court will deal with. So it will come up there."

The trial court reiterated its position at the motion hearing. Although the court acknowledged Watts had a due process right to a fair trial, the court maintained that ineffective assistance of counsel was not a cognizable basis for a new trial. "If you believe that your lawyer should have basically called [Little Chris] as a witness, maybe your lawyer should have. That's ineffective assistance of counsel. That will come out on appeal. That is not basically within the grounds for a motion for new trial." "Now I keep telling you over and over again this is not an appeal. Maybe [defense counsel] was incompetent, maybe he was ineffective. Maybe so. Maybe the gang [evidence] shouldn't have come in, maybe so[.] I'm not suggesting it should or it shouldn't. That is not what we're here to decide, okay. We're here to decide if the court made an error. . . . So the court is bound by the mandates of section 1181 in terms of making a decision."

Watts cited *People v. Mayorga* (1985) 171 Cal.App.3d 929 in support of the court's ability to review his ineffective assistance claim.[15] Despite the court's prior acknowledgment that a defendant could move for a new trial based on an alleged due process violation rather than the statutory grounds listed in section 1181, the court continued to maintain it had no authority

_____

[15] *People v. Mayorga, supra,* 171 Cal.App.3d at page 940 held that "new trials may be ordered for nonstatutory reasons when an error has occurred resulting in the denial of defendant's right to a fair trial, *and* the defendant has had no earlier opportunity to raise the issue." (See *People v. Fosselman* (1983) 33 Cal.3d 572, 582–583; *People v. Davis* (1973) 31 Cal.App.3d 106, 110; *People v. Oliver* (1975) 46 Cal.App.3d 747, 751–752.)

to review Watts's ineffective assistance of counsel claim. Watts asked the court, "Your honor, if I understand you correct[ly], basically you're saying that . . . whether he's incompetent or not, it's . . . not for you to decide, correct?" The court answered, "That's right. Exactly what I'm saying. That will be decided by a higher court. That's exactly what I'm saying."

However, the court *also* declined to address the claim because Watts had failed to present any admissible evidence to support his claim. On a motion for a new trial, the defendant has the burden of showing both the ineffectiveness of counsel and the prejudice it caused. (*People v. Dennis* (1986) 177 Cal.App.3d 863, 872.) Nevertheless, Watts did not submit a declaration or affidavit from defense counsel regarding his decision not to call Little Chris as a trial witness. Nor did Watts call counsel as a witness at the motion hearing.[16] Although Watts had procured a declaration from Little Chris, which was then submitted to the trial court, Little Chris was not present at the hearing. "I can't reweigh a piece of paper and decide it would have a good outcome based on a piece of paper rather than somebody coming to court

---

[16] Conversely, however, the prosecutor offered some possible insight into defense counsel's decision. The prosecutor noted that counsel had listened to Little Chris' recorded statement before trial and "there were specific aspects of [Little Chris'] statement that were inconsistent and undermined his credibility as a witness, as well as whatever was going on with [Little Chris'] prior history." In short, the prosecutor said, counsel "listened to the recording, made assessments about the substance of it, and the declarant himself . . . and made a conclusion based upon his experience that this person was not going to assist the case for Mr. Watts."

to testify," the court told Watts. "I can't do it. I'm not going to do it."[17]

Although the trial court appears to have misunderstood its prerogative to review Watts's claim, the error was also compounded by Watts's failure to fully present this particular claim to the trial court. "You have presented nothing that would suggest—other than you surmising or speculating or you believe that if somebody else had been called as a witness that would have made a difference. I respect that you believe that," the court told Watts. "But there is no—there is nothing in evidence to basically support or substantiate that other than your beliefs."

Although section 1181 sets forth nine grounds for granting a motion for a new trial, ineffective assistance of counsel is not one of them. The California Supreme Court has explained, however, that "in appropriate circumstances, the trial court should consider a claim of ineffective assistance of counsel in a motion for new trial, because '*justice is expedited* when the issue of counsel's effectiveness can be resolved promptly at the trial level.'" (*People v. Cornwell* (2005) 37 Cal.4th 50, 101.)

"But our assumption has been that courts would decide such claims in the context of a motion for new trial when the court's *own observation* of the trial would supply a basis for the court to act expeditiously on the motion." (*People v. Cornwell*, *supra*, 37 Cal.4th at p. 101, italics added.) "It is undeniable that trial judges are particularly well suited to *observe courtroom performance* and to rule on the adequacy of counsel in criminal cases tried before them. [Citation.] Thus, in appropriate

---

[17] The trial court also noted that the declaration was hearsay, had been signed three months earlier, and contained inconsistent statements.

22

circumstances justice will be expedited by avoiding appellate review, or habeas corpus proceedings, in favor of presenting the issue of counsel's effectiveness to the trial court as the basis of a motion for new trial. If the court is able to determine the effectiveness issue on such motion, it should do so." (*People v. Fosselman*, *supra*, 33 Cal.3d at pp. 582–583, italics added.)

Here, Watts's claim of ineffective assistance of counsel was not necessarily appropriate for resolution in a new trial motion because it involved defense counsel's action, or inaction, outside the courtroom, in deciding whether to call Little Chris as a witness. As the trial court noted, "based on my observation of the way [defense counsel] conducted this trial . . . , there is no basis for me to decide he was basically ineffective as to how he basically tried the case." Furthermore, ineffective assistance of counsel claims "must be supported by declarations or other proffered testimony establishing both the substance of the omitted evidence and its likelihood for exonerating the accused." (*People v. Cox* (1991) 53 Cal.3d. 618, 662.) Thus, Watts's failure to provide a declaration or affidavit from defense counsel to support his claim of deficient performance or prejudice, as well as Watts's failure to call Little Chris to the stand at the motion hearing, left the trial court with little choice. (See *People v. Jackson* (1986) 187 Cal.App.3d 499, 507 [upholding denial of new trial motion based on ineffective assistance of counsel because defendant did not submit affidavits or testimony]; *People v. Dennis*, *supra*, 177 Cal.App.3d at p. 873 [defendant must establish "by affidavit, oral testimony or reference to the trial record" that trial counsel was ineffective].)

"Reviewing courts will reverse convictions on the ground of inadequate counsel only if the record on appeal affirmatively

discloses that counsel had no rational tactical purpose for his act or omission. In all other cases the conviction will be affirmed and the defendant relegated to habeas corpus proceedings." (*People v. Fosselman*, *supra*, 33 Cal.3d at p. 581.) Whatever counsel's motive for not calling Little Chris as a trial witness, the record does not establish that counsel had no reasonable basis for his decision. If Watts wishes to pursue the point, therefore, he may do so by petition for habeas corpus.[18] (See *id*. at p. 582.)

## II. Watts's remaining claims

Watts also contends that the trial court erred when it precluded him from introducing evidence of Videau's blood alcohol level at the time of the shooting and that instructing the jury using CALCRIM No. 315 violated his due process rights. Neither argument has merit.

### A. VIDEAU'S BLOOD ALCOHOL LEVEL

During trial, the prosecution moved to exclude Videau's toxicology results under Evidence Code section 352, arguing they were irrelevant and that the prejudicial effect of the evidence outweighed any probative value.[19] The defense countered that

---

[18] We reach the same conclusion with respect to counsel's other alleged errors. Once again, Watts's claims involved defense counsel's action, or inaction, outside the courtroom and Watts failed to procure a declaration or affidavit from counsel that discussed these particular decisions. Thus, if Watts wishes to pursue the point, he may do so by petition for habeas corpus.

[19] Pursuant to Evidence Code section 352, "[t]he court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

the toxicology results were relevant when evaluating Michelle Howard's credibility. Although Howard testified she had one or two beers with Videau, his blood alcohol content level was .32, nearly three times the legal limit. The defense argued that since Howard was with Videau for hours before the shooting, Videau's level of intoxication was relevant to assess Howard's credibility as well as her ability to perceive and relay accurate information. The prosecution responded that no evidence supported the defense claim that Howard was with Videau throughout the night, and it was possible Videau had consumed alcohol outside of Howard's presence. The trial court agreed, noting that Howard's testimony never established how long they were together. Indeed, Howard testified that there were times when she did not see Videau.

The defense also argued that Videau's blood alcohol level was relevant because "at least some circumstantial evidence" showed more drinking took place than what Howard had described. The trial court noted that many factors contribute to blood alcohol levels, including tolerance for alcohol, and the duration an individual had been drinking. In this case, Howard met Videau on the night of the shooting. She did not know how alcohol affected Videau and, to the extent the defense suggested otherwise, no evidence supported this argument. The trial court concluded that defense counsel's arguments were "just speculation and conjecture" and that, without more, Videau's blood alcohol level would be excluded.

A trial court has discretion to admit or exclude evidence offered for impeachment. (*People v. Brown* (2003) 31 Cal.4th 518, 534.) We review for abuse of discretion a trial court's ruling to admit or exclude proffered evidence under Evidence Code

25

section 352.  (*People v. Hamilton* (2009) 45 Cal.4th 863, 929–930.)  A court abuses its discretion when its ruling "falls outside the bounds of reason."  (*People v. Osband* (1996) 13 Cal.4th 622, 666.)  In other words, abuse of discretion is established by showing the trial court exercised its discretion in an "arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice."  (*People v. Carrington* (2009) 47 Cal.4th 145, 195.)

We agree with the trial court that the connection between the excluded evidence and the issues at this trial was unduly tenuous.  Indeed, although the defense argued that Videau's intoxication had some bearing on Howard's credibility and her ability to perceive and relay accurate information, there was no evidence that Howard was with Videau throughout the night.  While both attended a party before the shooting, they did not meet until after the party was over.  Howard left the party by herself and then went to the Imperial Courts Housing Projects where she met Videau.  She accompanied Videau for a few hours before the shooting took place.  As the trial court recognized, Videau could have consumed alcohol at the party, outside of Howard's presence or knowledge.  Thus, there was no evidence that Howard knew how much alcohol Videau had consumed throughout the night.

Even if Howard had somehow acquired this knowledge, there was no evidence she also knew Videau's tolerance level for alcohol.  As the trial court noted, tolerance varies with each individual and thus it was speculative to conclude that Howard had the ability to assess the effect of alcohol on Videau.  This is especially true given that there was no testimony that Videau showed any visible signs of intoxication.  Consequently, Videau's

blood alcohol results neither undercut Howard's credibility nor called her ability to perceive events into question. Accordingly, the trial court did not abuse its discretion in excluding Videau's toxicology results.

Furthermore, evidence is prejudicial within the meaning of Evidence Code section 352 if it tends to evoke an emotional bias against a person or to cause the jury to prejudge a person or cause on the basis of extraneous factors. (*People v. Cowan* (2010) 50 Cal.4th 401, 475.) In short, a trial court " ' "is not required to admit evidence that merely makes the victim of a crime look bad." ' " (*People v. Loker* (2008) 44 Cal.4th 691, 736; see *People v. Kelly* (1992) 1 Cal.4th 495, 523 [rejecting defendant's attempted introduction of toxicology reports showing drugs and alcohol in victim's blood where results were irrelevant to issues presented].)

Finally, exclusion of this evidence did not interfere with Watts's constitutional right to present a defense. "As a general matter, the '[a]pplication of the ordinary rules of evidence . . . does not impermissibly infringe on a defendant's right to present a defense.' " (*People v. Fudge* (1994) 7 Cal.4th 1075, 1102–1103.) "Although completely excluding evidence of an accused's defense theoretically could rise to this level, excluding defense evidence on a minor or subsidiary point does not impair an accused's due process right to present a defense." (*Id*. at p. 1103.) In other words, a defendant has no constitutionally protected right to introduce evidence that is irrelevant or only remotely relevant. (*People v. Hall* (1986) 41 Cal.3d 826, 834–835.) The toxicology results, which had little probative value, were only remotely relevant.

27

Nor did the trial court violate Watts's confrontation clause rights. " '[T]rial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant.' [Citations.] Exclusion of impeaching evidence on collateral matters which has only slight probative value on the issue of veracity does not infringe on the defendant's right of confrontation." (*People v. Greenberger* (1997) 58 Cal.App.4th 298, 350; see *Delaware v. Van Arsdall* (1986) 475 U.S. 673, 679; *People v. Cooper* (1991) 53 Cal.3d 771, 817.) Because the toxicology results in this case had only slight or no probative value with respect to Howard's veracity or observational abilities, their exclusion did not infringe on Watts's right of confrontation.

B.    CALCRIM No. 315

CALCRIM No. 315 enumerates the factors a jury is to consider when evaluating identification testimony. The pattern jury instruction lists 14 different factors a jury may consider in evaluating that testimony. One of those factors is: "How certain was the witness when he or she made an identification?" Watts contends CALCRIM No. 315 is unconstitutional because it instructs the jury to consider a witness's degree of certainty when evaluating eyewitness identification. However, a series of cases from the United States and California Supreme Courts, and California appellate courts, have repeatedly found that "certainty" is an appropriate factor to evaluate eyewitness identifications, and that CALCRIM No. 315, as well as its

predecessor CALJIC No. 2.92, are correct statements of the law and constitutional.[20]

For example, in *Neil v. Biggers* (1972) 409 U.S. 188, the United States Supreme Court identified several factors to consider when determining the reliability of an identification, including the level of certainty demonstrated by the witness at the confrontation. (*Id.* at pp. 199–200.) In *Perry v. New Hampshire* (2012) 565 U.S. 228, the United States Supreme Court addressed a defendant's due process argument regarding the reliability of an identification. In so doing, *Perry* cited the factors set forth in *Neil*, including certainty, and held that these factors are properly considered when evaluating the reliability of eyewitness identifications. (*Id.* at pp. 239–241 & fn. 5.) In *People v. Gaglione* (1994) 26 Cal.App.4th 1291, the defendant argued that the certainty factor in CALJIC No. 2.92 was erroneous and should have been deleted. (*Id.* at pp. 1302–1303.) *Gaglione* held the instruction was proper because it did not take a position on the significance of the witness's certainty, but merely called attention to certainty as a factor. (*Ibid*.) A similar result was reached in *People v. Sullivan* (2007) 151 Cal.App.4th 524, which rejected the defendant's argument that the trial court should have deleted the certainty factor from the instruction. (*Id.* at pp. 561–562.)

Although Watts cites studies and out-of-state cases that have questioned the validity of certainty as a factor when evaluating eyewitness testimony, the California Supreme Court recently rejected an attack on the "certainty" factor, similar to

---

[20] CALJIC No. 2.92 instructed the jury that it should consider "[t]he extent to which the witness is either certain or uncertain of the identification."

the one which Watts has raised here. "Studies concluding there is, at best, a weak correlation between witness certainty and accuracy are nothing new. We cited some of them three decades ago to support our holding that the trial court has discretion to admit expert testimony regarding the reliability of eyewitness identification." (*People v. Sanchez* (2016) 63 Cal.4th 411, 462 (*Sanchez*).) Indeed, our Supreme Court noted it had "specifically approved" CALJIC No. 2.92, including its certainty factor and has "since reiterated the propriety of including this factor." (*Ibid*.) *Sanchez* further held that the defendant did not suffer any prejudice from the court's use of the instruction. "The instruction cited the certainty factor in a neutral manner, telling the jury only that it could consider it. It did not suggest that certainty equals accuracy. In this case, telling it to consider this factor could only benefit defendant when it came to the uncertain identifications, and it was unlikely to harm him regarding the certain ones." (*Ibid*.)

We are bound by the California Supreme Court ruling in *Sanchez*, *supra*, 63 Cal.4th 411 as well as the United States Supreme Court's continued approval of the "certainty" factor in *Neil v. Biggers*, *supra*, 409 U.S. 188 and *Perry v. New Hampshire*, *supra*, 565 U.S. 228. We hold the court correctly instructed the jury with CALCRIM No. 315. To that end, we also hold that defense counsel's failure to object to the instruction was not ineffective assistance. As with the other attorney errors alleged by Watts, defense counsel was not given an opportunity to offer reasons for the inaction. Speculating that no reasonable tactical or strategic reason supported the failure to object does not establish ineffective assistance of counsel. (See *People v. Mattson* (1990) 50 Cal.3d 826, 876, 877.)

Moreover, counsel was not required to make a meritless objection.  (See *People v. Ochoa* (1998) 19 Cal.4th 353, 463.)

## PETITION FOR REVIEW

After we published our opinion, Watts sought review in the California Supreme Court.  In an order filed February 21, 2018, the Supreme Court granted review and ordered the matter transferred back to this court with directions to vacate its decision and reconsider the cause in light of Senate Bill 620's recent amendments to section 12022.53.

On October 11, 2017, the Governor signed Senate Bill 620, which amends section 12022.53 to give trial courts the authority to strike in the interests of justice a firearm enhancement allegation found true under that statute.  Effective January 1, 2018, section 12022.53, subdivision (h), was amended to state: "The court may, in the interest of justice pursuant to Section 1385 and at the time of sentencing, strike or dismiss an enhancement otherwise required to be imposed by this section. The authority provided by this subdivision applies to any resentencing that may occur pursuant to any other law."  (Stats. 2017, ch. 682, § 2.)

Pursuant to *In re Estrada* (1965) 63 Cal.2d 740, we hold that the section 12022.53, subdivision (h), amendment applies here.  Under *Estrada*, courts presume that, absent evidence to the contrary, the Legislature intends an amendment reducing punishment under a criminal statute to apply retroactively to cases not yet final on appeal.  (*Id.* at pp. 747–748; see *People v. Brown* (2012) 54 Cal.4th 314, 324.)  *Estrada* has been applied not only to amendments reducing the penalty for a particular offense, but also to amendments giving the court the discretion to impose a lesser penalty.  (*People v. Francis* (1969) 71 Cal.2d 70, 75.)

Furthermore, because this opinion will be issued after January 1, 2018, the issue is now ripe.  Although we express no opinion as to how the trial court should exercise its newly granted discretion under section 12022.53, subdivision (h), we do conclude that the trial court must exercise this discretion in the first instance.[21]

## DISPOSITION

The trial court's order denying Bobby Watts's new trial motion is affirmed in part and reversed in part.  The order is reversed with respect to the gang enhancement allegation (Pen. Code, § 186.22, subd. (b)(1)(C)) and the firearm enhancement (Pen. Code, § 12022.53).  The trial court is directed to (1) conduct a limited rehearing as to whether the evidence was sufficient to sustain the jury's true finding as to the gang enhancement allegation and (2) hold a sentencing hearing to consider whether, pursuant to Penal Code section 12022.53, subdivision (h), to strike or dismiss an enhancement otherwise required by Penal Code section 12022.53.  The trial court shall also recalculate Watts's pretrial custody credits at that time.  In all other respects, the order is affirmed.

CERTIFIED FOR PARTIAL PUBLICATION.


JOHNSON, J.

We concur:


ROTHSCHILD, P. J.          LUI, J.

---

[21] The People filed a supplemental brief after the Supreme Court remanded the case and agree with this result.